T.C. Memo. 2009-119

UNITED STATES TAX COURT

ESTATE OF VALERIA M. MILLER, DECEASED, VIRGIL G. MILLER,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5207-07.                    Filed May 27, 2009.

Miriam R. Price and Adria S. Price, for petitioner.

Mark D. Eblen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Respondent determined a deficiency of

$1,019,399 in the Federal estate tax of the Estate of Valeria M.

Miller (the estate).  There are two issues for decision.[1]  First

_____

[1]On brief the parties agree that the estate is entitled to
deduct $12 for unpaid income taxes.
                                        (continued...)

we must decide whether the value of the gross estate includes an amount for which the estate of Valeria M. Miller's (decedent's) predeceased husband (Mr. Miller) claimed a marital deduction.  We find that those amounts for which Mr. Miller's estate claimed a marital deduction are properly included in the value of decedent's gross estate.  Second, we must determine whether the estate is required to include in the gross estate the total value of assets transferred to decedent's family limited partnership in April 2002 and May 2003, or if those transfers qualify for a discount.  We find the value of those securities transferred to decedent's family limited partnership in April 2002 qualifies for a discount, while the value of those assets transferred in May 2003 does not qualify for a discount.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death and all Rule references are to the Tax Court Rules of Practice and Procedure.

---

[1](...continued)
Further, the estate raised on brief the issue of a deduction for legal fees incurred after decedent's estate's estate tax return was filed.  Respondent in reply conceded that the estate will be allowed a deduction for legal fees incurred at or after trial to the extent the estate is able to substantiate those fees.  These issues will be addressed in the parties' Rule 155 computation.

FINDINGS OF FACT

1. <u>Introduction</u>

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. On the date of her death, May 28, 2003, decedent was a resident of Indiana. Virgil G. Miller (Virgil G.) was appointed executor of decedent's estate. At the time the petition was filed on behalf of the estate, Virgil G. was a resident of Indiana.

2. <u>Mr. Miller</u>

Decedent married Mr. Miller on February 12, 1938, and they remained married until Mr. Miller's death on February 2, 2000. Decedent and Mr. Miller had four children: Virgil G., born August 1939; Gordon, born July 1942; Donald, born July 1944; and Marcia, born December 1946. Virgil G. is a retired architect. Donald is a retired manager of recreation activities at Fort Benjamin Harrison. Marcia was married but separated from her husband in September 2002. They were divorced in January 2003, and she died in February 2006.

Mr. Miller was an architect until his retirement at age 60. Decedent served as Mr. Miller's secretary and helped start his architecture business. From retirement to his death at age 86 in 2000, Mr. Miller devoted his time to researching and investing in securities. Mr. Miller spent significant time managing his

family's investments and employed a specific investment methodology--charting stocks. Charting stocks involved the purchase and sale of securities on the basis of an analysis of their daily high and low values. Mr. Miller kept handwritten records of his investment activity.

On October 29, 1991, Mr. Miller established the Virgil J. Miller Living Trust (the revocable trust). The agreement establishing the trust also established a life estate marital trust for decedent (the QTIP trust).

Mr. Miller predeceased decedent. Virgil G. as executor of the estate timely filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, with the Internal Revenue Service (IRS).

On the date of Mr. Miller's death, his gross estate was valued at $7,667,939. Of his gross estate, $7,635,755, or 99.6 percent, consisted of securities held by his revocable trust.

Virgil G. made an election pursuant to section 2056(b)(7) to treat the QTIP trust property as qualified terminable interest property. Mr. Miller's estate claimed a marital deduction of $1,060,000 for assets funding the QTIP trust. The QTIP trust was made up of five accounts with Merrill Lynch. On October 6, 2000, securities were transferred from the Virgil J. Miller Living Trust Merrill Lynch account to Merrill Lynch account No. 634-37225 (account 7225), in the name of the QTIP trust. The

securities had a fair market value of $1,113,372 on October 27, 2000. A portion of the securities used to fund account 7225 was then used to fund four additional Merrill Lynch accounts, numbered 8135 (account 8135), 8136 (account 8136), 8137 (account 8137), and 8138 (account 8138). The transfers from account 7225 to the additional four accounts were made in June 2001. Each transfer had a fair market value of about $100,000.

Virgil G. was trustee of the QTIP trust, and the trust agreement provided that all income of the QTIP trust was to be distributed to decedent at least annually and that income was not to accumulate in the QTIP trust. Decedent did not receive any distributions or income from the QTIP trust. All income from the QTIP trust was reported on its own Forms 1041, U.S. Income Tax Return for Estates and Trusts.

On October 9, 2000, the remaining assets in the revocable trust, then valued at approximately $3.6 million, were distributed to decedent's Revocable Living Trust (decedent's trust). Decedent's trust held an account with Merrill Lynch (decedent's trust's Merrill Lynch account) and an additional account at Fidelity Investments (decedent's trust's Fidelity Investments account).

3. Decedent's Social Life and Gift Giving

Decedent was involved in numerous community, social, and religious activities including volunteering at nursing homes,

joining a singing group, reading at church, and playing cards. Decedent was never deemed incapacitated or incompetent and was never under a guardianship.

Decedent made annual gifts to her children, her children's spouses, and her grandchildren, beginning by at least 1994 and continuing every year thereafter until her death. Decedent and Mr. Miller established trusts for the benefit of decedent's grandchildren. Virgil G. was trustee of each irrevocable trust. Decedent made annual gifts to the irrevocable trusts.

On May 1, 1994, decedent established the Valeria M. Miller Irrevocable Trust, of which Virgil G. was trustee. Decedent made annual gifts to the Valeria M. Miller Irrevocable Trust which were used by Virgil G. as trustee to pay life insurance premiums for life insurance policies on decedent. The trust owned two life insurance policies which were sold on August 3, 2002, for a total of $962,500. The proceeds were kept in the trust. The life insurance policies eventually paid benefits of $2,750,000 to the purchaser upon decedent's death.

On June 22, 1999, decedent signed a gift annuity agreement with the National Heritage Foundation, a charitable organization which paid her $4,390 per month for the rest of her life. At decedent's death the remainder was distributed to the National Heritage Foundation.

4. The Miller Family Limited Partnership

Mr. Miller and decedent received estate planning advice from David Price (Mr. Price) of Price & Collins, L.L.P. (Price & Collins). After Mr. Miller died, decedent sought further estate planning advice from Mr. Price. On the basis of Mr. Price's advice, decedent decided to form a family limited partnership. On November 21, 2001, the Indiana secretary of state issued a certificate of limited partnership of the V/V Miller Family Limited Partnership (MFLP). Decedent was 86 when MFLP was formed. The MFLP agreement was prepared by Mr. Price and was signed by Virgil G. as general partner, by decedent as trustee of her trust, and by Donald, Marcia, and Gordon as limited partners. Virgil G.'s address was used as MFLP's business address.

On December 13, 2001, MFLP applied for an Employer Identification Number, which it later received from the IRS. Although MFLP held no assets as of December 31, 2001, the fair market value per unit of a limited partnership interest in MFLP was appraised as of that date for gift tax purposes (the December 31, 2001, valuation). Because MFLP had not yet been funded, Virgil G. provided statements to the appraiser detailing the assets that were going to be used to fund MFLP.

The December 31, 2001, valuation indicates that MFLP had marketable equity securities as of that date of $4,336,380, a margin account payable of $499,573, and a net asset value of

$3,836,807. The December 31, 2001, valuation applied a 35-percent lack of marketability discount to the purported net asset value of MFLP and concluded that as of that date MFLP had a fair market value per unit of $2,264.73.

The MFLP agreement had not been signed as of February 8, 2002. On February 8, 2002, Mr. Price sent Virgil G. a letter along with a partnership agreement and signature pages for decedent and her children. On February 26, 2002, Virgil G. mailed the partners' individual signed signature pages back to Mr. Price. On March 6, 2002, a paralegal at Price & Collins sent Virgil G. the MFLP agreement along with certificates of partnership interest for him to sign. Virgil G. signed the certificates and dated them November 27, 2001.

On March 28, 2002, a paralegal at Price & Collins sent Virgil G. revised MFLP certificates and a revised MFLP agreement. Each of the intended partners of MFLP signed the partnership agreement and was issued a certificate representing his or her interests in the partnership. The MFLP issued 1,000 units; decedent's trust owned 920 units and continued to own that number on the date of her death. Decedent's children received their partnership units as gifts from decedent. Virgil G. received 10 general partner units and 10 limited partner units. Donald, Gordon, and Marcia each received 20 limited partner units. Decedent's children continued to own those units on the date of

decedent's death.  The MFLP agreement provided for centralized asset management by vesting management and control exclusively in the general partner, Virgil G.

The MFLP agreement provided:

The purpose of * * * [MFLP] shall be to buy, sell, and trade in securities of any nature, including short sales, on margin, and for such purposes may maintain and operate margin account with brokers, and to pledge any securities held or purchased by them with such brokers as security for loans and advances made to the Trustees; buy, sell and trade in commodities, commodity futures contracts and options on commodity futures contracts; and buy, sell, trade or deal in precious metals of any kind.  Additionally, to maintain a margin account with a stock brokerage firm, to execute all documents necessary for the opening and maintenance thereof, to borrow money from a brokerage firm, to pledge securities owned by the Trust as collateral and to grant a security interest therein, and to permit the stock brokerage firm to relend these securities in the ordinary course of its business.  Additionally * * * [MFLP] may acquire such assets and engage in investments of all types and any and all other lawful purposes that may be conducted by a limited partnership as deemed appropriate by the General Partner.

The MFLP agreement also included a right of first refusal should a limited partner wish to dispose of his or her interest in MFLP and a clause requiring the partners to submit any dispute among themselves to arbitration.  Further, Virgil G., as general partner, was required to act in furtherance of MFLP's interests and had fiduciary obligations to the partnership and the limited partners.

MFLP established accounts at Fidelity Investments and Merrill Lynch.  MFLP held one account at Fidelity (MFLP Fidelity account) and three accounts at Merrill Lynch, account Nos. 7B10,

7B12, and 7B13.  Decedent made her first contribution to MFLP in April 2002.

a.  Merrill Lynch Account Transfers

On March 28, 2002, MFLP's Merrill Lynch account No. 7B10 had a zero balance.  On April 10, 2002, decedent's trust contributed equity securities from decedent's trust's Merrill Lynch account to MFLP's Merrill Lynch account No. 7B10.  The securities had a value of $2,766,004   After this transfer was complete, funds were transferred from account No. 7B10 to account Nos. 7B12 and 7B13.

On April 18 and 22, 2002, MFLP transferred securities from MFLP's Merrill Lynch account No. 7B10 to MFLP's Merrill Lynch account No. 7B12.  The transferred securities had a value on April 30, 2002, of $92,246.  On April 18 and 22, 2002, MFLP transferred securities from MFLP's Merrill Lynch account No. 7B10 to MFLP's Merrill Lynch account No. 7B13.  The securities had a value on April 30, 2002, of $95,957.

b.  Fidelity Investments Account Transfers

On March 31, 2002, decedent's trust's Fidelity Investments account had a net value of $2,152,625.  On that same date MFLP's Fidelity Investments Account had a zero balance.

On April 10, 2002, decedent transferred $1,197,668 of securities from decedent's trust's Fidelity Investments account to MFLP's Fidelity Investments account.[2]

The April 2002 transfers constituted about 77 percent of decedent's net assets.

c.  Margin Accounts

Decedent's trust's Merrill Lynch and Fidelity Investments accounts often made purchases on margin.  When an investor purchases a security on margin, he or she buys the security on credit.  A margin balance is the total balance in a margin account.  If the balance is negative, then the amount shown is owed to a brokerage firm.  If the balance is positive, then that balance is available to earn interest.

Decedent's trust's Merrill Lynch and Fidelity Investments accounts both had negative margin balances after the transfers of securities described above, even though the securities purchased on margin were no longer in the trust's accounts.  In order to pay off the margin accounts, MFLP sold some of the securities

---

[2]The estate argues that respondent incorrectly valued this transfer because respondent used a monthly statement ending Apr. 30, 2002, as the source for pricing information.  However, the Fidelity Investments account statements show, in addition to beginning and ending account values, values per transaction. Respondent's valuation of the securities transferred mirrors the Fidelity account statement's valuations of the securities transfer.

purchased on margin and transferred to MFLP and transferred the proceeds back to decedent's trust's accounts.

On March 28, 2002, decedent's Trust's Merrill Lynch account had a debit balance of $276,926. On April 10, 2002, MFLP's Merrill Lynch account No. 7B10 transferred $277,400 to decedent's trust's Merrill Lynch account. Another transfer of $39.42 was made on April 10, 2002.

On April 17, 2002, MFLP sold, through MFLP's Merrill Lynch account No. 7B10, 13,600 shares of AOL Time Warner, Inc. and 680 shares of Cisco Systems, Inc. stock for $272,685 and $10,576 respectively (totaling $283,261).

On April 30, 2002, decedent's trust's Merrill Lynch account had a debit balance of $1,896, and MFLP's Merrill Lynch account No. 7B10 had a debit balance of $320.

On April 19, 2002, MFLP sold $147,249 in securities from MFLP's Fidelity Investments account. On April 15, 2002, MFLP transferred $51,801 in cash from MFLP's Fidelity Investments account to decedent's trust's Fidelity Investments account.

5. MFLP Management

Virgil G. owned VGM Enterprises. MFLP paid VGM Enterprises a monthly fee to manage the partnership's securities. Virgil G. was the only employee of VGM Enterprises and worked about 40 hours per week managing MFLP's assets. Mr. Miller had taught Virgil G. how to chart stocks, and Virgil G. managed MFLP's

assets according to this philosophy.  Virgil G. began managing the securities shortly after decedent's first transfers to MFLP in April 2002.  Virgil G. subscribed to trade publications and purchased computer software to assist him in researching securities and carrying out MFLP's securities trading.

6.  Contributions to MFLP in 2003

Decedent made additional contributions to MFLP in 2003. Although decedent had been suffering from certain chronic conditions associated with old age, her day-to-day health was strong.

On April 25, 2003, decedent suffered a fall at her residence and broke her hip.  The next day, while she was awaiting surgery, doctors discovered that decedent was having sinus pauses, which indicated that her heart was stopping longer than normal. Decedent underwent pacemaker implantation surgery on April 28, 2003, and orthopedic surgery to repair her broken hip on April 30, 2003.  The pacemaker implantation surgery was performed before the orthopedic surgery to ensure that decedent's heart was beating regularly and strongly when the hip surgery was performed, in order to increase decedent's chances of both surviving and recovering.

On May 8, 2003, decedent was discharged from the hospital and transferred to a continuing care facility for rehabilitation. Decedent was to undergo rehabilitation and physical therapy so

she would be able to return home.  On May 12, 2003, decedent was brought back to the hospital from the continuing care facility because she was retaining fluid and was short of breath.  Upon returning to the hospital decedent was diagnosed with congestive heart failure.

Hospital policy at that time was for all patients regardless of age to fill out code status forms and orders upon admission to the hospital.  These documents would inform the doctors caring for a patient of the patient's wishes and the type of action to be taken in the event of a medical episode.  On May 12, 2003, decedent's code status was Level I, Full Code, which indicated that if decedent was to experience any sort of acute medical episode, all measures possible would be undertaken to return decedent to consciousness and health.

On May 19, 2003, a bruise was discovered on decedent's scalp while her daughter and daughter-in-law were fixing her hair.  A CT scan performed that same day revealed a moderately enlarged subacute subdural hematoma, a type of traumatic brain injury.

On May 20, 2003, decedent's doctor discussed with her and her family surgical options versus comfort care only.  On that same day decedent's code order was changed to Level IV, No Code, Comfort Measures Only.  Decedent died on May 28, 2003.  Her death

certificate stated the cause of death as "Coroner-Respiratory Arrest; Subdural Hematoma; Fall".[3]

### a. Fidelity Investments Accounts

After decedent broke her hip but before her bruise was discovered, she signed a letter dated May 9, 2003, addressed to Fidelity Investments requesting that Fidelity Investments transfer all of her assets, except for cash in her Fidelity Investments money market account, over and into MFLP's Fidelity Investments account. Virgil G. wrote the letter and cosigned as trustee of decedent's trust. On May 17, 2003, Virgil G. wrote a check from decedent's trust's Fidelity Investments account in the amount of $105,000 as an additional capital contribution to MFLP.

There appear to have been a number of transfers between decedent's trust's Fidelity Investments account and MFLP's Fidelity Investments account in May 2003. However, the amounts and dates of these transfers are recorded differently on the May and June 2003 account statements issued to MFLP.

The May 2003 statement shows a transfer of securities worth approximately $79,690 from decedent's trust's Fidelity Investments account to MFLP's Fidelity Investments account on May 15, 2003. This transfer was made up of decedent's holdings in three corporations.

---

[3]The death certificates listed the causes of death backwards--i.e., a fall caused a subdural hematoma, which caused respiratory arrest.

The May 2003 statement also shows a transfer of securities worth approximately $930,751 from decedent's trust's Fidelity Investments account to MFLP's Fidelity Investments account on May 20, 2003.  This transfer was substantially all of decedent's holdings in her trust's Fidelity Investments account and appeared to include the securities that had already been transferred to MFLP on May 15, 2003.

Lastly, the May 2003 Fidelity Investments account statement shows a transfer of securities worth approximately $950,286 from MFLP's Fidelity Investments account back to decedent's trust's Fidelity Investments account.

Thus, according to the May 2003 MFLP Fidelity Investments account statement, the net amount of distributions from decedent's trust's Fidelity Investments account to MFLP's Fidelity Investments account was $60,155.  Decedent's trust's Fidelity Investments account would have had a balance of $889,898 on May 31, 2003.

The June 2003 statement for decedent's trust's Fidelity Investments account, however, shows only one transfer:  a transfer of assets worth approximately $878,069 from decedent's trust's Fidelity Investments account to MFLP's Fidelity Investments account on May 15, 2003.  The May and June 2003 statements do not explain why the transfers are recorded differently on the respective statements.  According to the June

2003 statement, decedent's trust's Fidelity Investments account had a balance of $49,180 on June 30, 2003. Virgil G. explained that the discrepancy resulted from errors made by Fidelity and that he never authorized the transfer of any securities from MFLP back to decedent's trust.

b. Merrill Lynch Accounts

On April 30, 2003, decedent's trust's Merrill Lynch account had a balance of $184,819. On May 19, 2003, decedent's trust's Merrill Lynch account transferred all of its marketable securities and $14,650 to MFLP's Merrill Lynch account No. 7B10. On May 30, 2003, decedent's trust's Merrill Lynch account had a balance of $7.

The MFLP is still in existence, and Virgil G. continues to serve as general partner. MFLP made no distributions to Virgil G., Gordon, Donald, or Marcia in 2002 and 2003.

Decedent's will devises the remainder of her estate, after payment of administration expenses, to decedent's living trust. Decedent's living trust agreement provides that upon decedent's death the assets in her trust are divided into a portion A trust and a portion B trust. The portion A trust was to be a generation-skipping transfer tax exempt trust. The portion B trust would be funded with the remainder of decedent's estate after the portion A trust was funded. The portion B trust was

divided into four subtrusts for the benefit of each of decedent's four children.

On January 29, 2004, MFLP made a pro rata cash distribution to its partners.  MFLP disbursed $23,913 from its Fidelity Investments account to each of Virgil G., Gordon, Marcia, and Donald and disbursed $1.1 million to decedent's trust.  A portion of the $1.1 million was used to pay decedent's estate's Federal and State estate tax liabilities.

7.  MFLP Trading Activity

As discussed above, Mr. Miller spent his retirement charting stocks and managing the family's investments.  Decedent wanted the family assets to be managed in accordance with Mr. Miller's investment strategy after her death.  MFLP actively managed the cash and securities decedent transferred in April 2002 and March 2003.  Before making contributions to MFLP decedent's trust's accounts made very few trades, but trading activity increased after the securities were transferred to MFLP.  The overall value of the transactions varied month to month.  However, MFLP's Merrill Lynch account Nos. 7B12 and 7B13 showed sales and purchases of about $3,000 to $4,000 per month during 2002 and 2003.  Virgil G., as general partner, also kept his siblings informed about MFLP's status and provided financial advice to them.

A Form 706 was filed on behalf of the Estate of Valeria M. Miller on February 22, 2004. The Form 706 showed a gross estate of $2,637,024, and tax due of $994,299. The gross estate included 920 MFLP units valued at $2,589,118. The Form 706 did not include the values of the securities used to fund the QTIP trust in the value of the gross estate. Decedent's Form 706 indicated that decedent was the beneficiary of a trust for which a deduction was claimed by the estate of a predeceased spouse under section 2056(b)(7) and which was not reported on decedent's Form 706.

On November 30, 2006, respondent issued a notice of deficiency (the notice) that, in part, increased the value of decedent's gross estate by $546,702, the purported fair market value of the securities in the QTIP trust, and by the amount of decedent's transfers to MFLP. A timely petition for redetermination was filed with the Court on March 5, 2007.

OPINION

A Federal estate tax is imposed "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Sec. 2001(a). The estate tax is imposed on the value of the taxable estate with specified adjustments made. Sec. 2001(b). The value of a decedent's taxable estate is the value of the gross estate less enumerated deductions. Sec. 2051. The value of the gross estate includes the values of all of

decedent's property to the extent provided under sections 2033 through 2045.  Sec. 2033.

I.  Burden of Proof

Generally the taxpayer bears the burden of proving the Commissioner's determinations are erroneous.  Rule 142(a). However, with respect to a factual issue relevant to the liability of a taxpayer for tax, the burden may shift to the Commissioner if the taxpayer has produced credible evidence relating to the issue, met substantiation requirements, maintained records, and cooperated with the Secretary's reasonable requests for documents, witnesses, and meetings.  Sec. 7491(a).  Neither party addressed the burden of proof.  Our resolution of the issues is based on the preponderance of the evidence rather than the allocation of the burden of proof.

II.  Mr. Miller's Estate's Marital Deduction

We first determine whether decedent is required to include in her estate the securities used to fund the QTIP trust.  As discussed above, Mr. Miller's estate claimed a marital deduction in the amount of the fair market value of those securities.

Section 2056(a) grants a deduction for the value of any interest in property passing to a surviving spouse which is included in determining the value of the gross estate.  Pursuant to section 2056(b)(1), a marital deduction cannot ordinarily be claimed for property passing to a surviving spouse where the

interest of a surviving spouse may eventually terminate or fail. However, section 2056(b)(7) allows a marital deduction for qualified terminable interest property (QTIP). QTIP is defined in section 2056(b)(7)(B)(i) as property which passes from a decedent, in which the surviving spouse has a qualified income interest for life, and to which an election applies.

Section 2056(b)(7)(B)(ii) provides that the surviving spouse has a qualifying income interest for life if the surviving spouse is entitled to all the income from the property, payable annually or at more frequent intervals, and no person has a power to appoint any part of the property to any person other than the surviving spouse. Under section 2056(b)(7)(A), QTIP is treated for purposes of section 2056(a) as passing to the surviving spouse and for purposes of section 2056(b)(1)(A) as not passing to any person other than the surviving spouse. Pursuant to section 2056(b)(7)(B)(v), a QTIP election with respect to any property shall be made by the executor on the Federal estate tax return and once made is irrevocable.

Section 2044 sets forth the tax treatment of QTIP in the estate of the surviving spouse. Under section 2044(a), the value of the gross estate includes the value of any property to which this section applies in which the decedent had a qualifying income interest for life. Section 2044(b)(1)(A) applies section 2044(a) to any property if a deduction was allowed with respect

to the transfer of such property to the decedent under section 2056(b)(7).  See Estate of Cavenaugh v. Commissioner, 100 T.C. 407, 417 (1993), affd. in part on this issue and revd. in part 51 F.3d 597, 599-601 (5th Cir. 1995).

Under section 2056(b)(7)(B)(ii), the relevant questions are whether decedent was entitled to all the income from the property, payable at least annually, and whether any person had a power to appoint any part of the property to any other person. See Estate of Soberdash v. Commissioner, T.C. Memo. 1997-362.

Respondent argues that the estate is required to include the value of the assets in the QTIP trust on decedent's date of death in the value of decedent's gross estate because a QTIP deduction under section 2056(b)(7) was allowed for assets funding a QTIP trust, a QTIP election was made, decedent had the right to receive income from the trust annually, and decedent did not dispose of her income interest in the trust before she died.

The estate argues that the value of the assets funding the QTIP trust should not be included in the value of decedent's gross estate because decedent did not receive an interest in the trust or retain it at her death.  The estate argues that decedent never received income or distributions from the trust, was never considered to have an interest in the trust, and to the extent

she had an interest in the trust, effectively refuted it before her death.[4]

Respondent disputes the estate's contention, arguing that there is no evidence that decedent refuted or disposed of her interest in the trust.  Respondent also points to testimony by Mr. Price, decedent's lawyer, who testified that decedent never disposed of her interest in the QTIP trust.

We agree with respondent.  The fair market value of the securities in the QTIP trust must be included in the value of decedent's gross estate.  The trust agreement provided that all income of the trust was to be distributed to decedent at least annually and that income was not to accumulate in the trust.  Mr. Miller's estate made a valid QTIP election, and Mr. Miller's estate's Form 706 claimed a $1,060,000 marital deduction under section 2056(b)(7).

Decedent's Form 706 indicated that decedent had been the beneficiary of a distribution for which a section 2056(b)(7) election had been made but did not include the value of the assets funding the QTIP trust.  Decedent did not dispose of her income interest in the trust before she died.

---

[4]The estate argues that should we find that decedent was required to include the QTIP in her estate and did not dispose of her income interest, we should take the fair market value of those securities into account in the context of sec. 2036 when evaluating whether decedent retained sufficient funds after funding MFLP.

Although the estate argues that the amounts should not be included in the estate because decedent never needed the income, the relevant questions under section 2056(b)(7)(B)(ii) are whether decedent was entitled to all of the income from the property, payable at least annually, and whether any person had a power to appoint any part of the property to any other person. See Estate of Soberdash v. Commissioner, supra. These requirements were met. The need of the surviving spouse has no bearing on the eligibility for a deduction under section 2056(b)(7) or the subsequent inclusion in the surviving spouse's gross estate under section 2044. Id.

As discussed above, the QTIP trust assets comprised five Merrill Lynch bank accounts. The parties dispute the fair market value of the securities that must be included in the value of decedent's gross estate. The notice valued the securities on the date of decedent's death at $546,702. Respondent argues that this is the amount that must be included under section 2044. Respondent does not point to any other evidence in the record supporting this calculation.

The estate argues that respondent's calculation is incorrect and values the securities at $526,758. The estate contends that respondent overstates the value of the securities because respondent counts certain securities in one of the QTIP trust's accounts twice.

There is no evidence in the record concerning the fair market value of the securities on May 28, 2003, the date of decedent's death. However, the record does contain account statements for the five Merrill Lynch accounts for the period ending May 30, 2003. The May 2003 account statements for the accounts at issue, stipulated by the parties, do not indicate that any securities were counted more than once in determining the value of the account.

The statement for account No. 7225 is incomplete. However, the account statement for account No. 8135 includes values for both account Nos. 8135 and 7225. The account statement for account No. 8135 values account No. 7225 at $202,850[5] and account No. 8135 at $102,051, for a total of $304,902.[6] The account statement for account No. 8136 values that account at $69,151. The account statement for account No. 8137 values that account at $88,192. Lastly the account statement for account No. 8138 values that account at $70,980. These statements value the five accounts at $533,225. Accordingly, decedent's gross estate is increased by $533,225 pursuant to section 2044.

---

[5]The value of account No. 7225 ($202,850) in the account statement for account No. 8135 matches a summary contained in the aforementioned incomplete account statement for account No. 7225.

[6]The $1 difference is due to rounding.

III.  Decedent's Contributions to MFLP

Lastly we determine whether the cash and securities decedent transferred to MFLP in April 2002 and May 2003 must be included in the value of decedent's gross estate under section 2036 at their fair market value or are entitled to a discount. Decedent's gross estate included 920 partnership units in MFLP. The 920 partnership units were valued at $2,589,118 after application of a 35-percent discount.  Respondent does not contest the amount of the discount that the estate claimed on decedent's estate's Form 706.  Rather, respondent argues that the estate is not entitled to any discount and must include the full value of the transferred assets in the value of the gross estate.

The purpose of section 2036 is to include in a deceased taxpayer's gross estate inter vivos transfers that were testamentary.  United States v. Estate of Grace, 395 U.S. 316 (1969).  Section 2036(a) generally provides that if a decedent made an inter vivos transfer of property, other than a bona fide sale for adequate and full consideration, and retained certain enumerated rights or interests in the property which were not relinquished until death, the full value of the transferred property will be included in the value of the decedent's gross estate.  Section 2036(a) is applicable when three conditions are met:  (1) The decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate

and full consideration; and (3) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) or (b) in the transferred property which she did not relinquish before her death. Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).

The bona fide sale for adequate and full consideration exception is limited to a transfer of property where the transferor "has received benefit in full consideration in a genuine arm's length transaction". Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951). In Estate of Bongard v. Commissioner, supra at 118, we held that the exception for a bona fide sale for an adequate and full consideration in money or money's worth is satisfied in the context of a family limited partnership--

> where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred. See, e.g. Estate of Stone v. Commissioner, * * * [T.C. Memo. 2003-309]. The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation. * * * A significant purpose must be an actual motivation, not a theoretical justification.

The bona fide sale exception is not applicable "where the facts fail to establish that the transaction was motivated by a legitimate and significant nontax purpose." Id. In Estate of Bongard v. Commissioner, supra at 118-119, we listed a number of factors that support such a finding, including

the taxpayer's standing on both sides of the transaction, * * * the taxpayer's financial dependence on distributions from the partnership, * * * the partners' commingling of partnership funds with their own, * * * and the taxpayer's actual failure to transfer the property to the partnership. * * *

Respondent argues that decedent's transfer of assets to MFLP is not exempt from the application of section 2036(a) because the transfer did not constitute a bona fide sale for adequate and full consideration. Respondent points to the following factors as evidence that the transfer was not bona fide: (1) MFLP's lack of a functioning business operation; (2) the delay in making contributions to MFLP after MFLP was formed and the partnership agreement was signed; (3) the type of assets transferred; (4) decedent's age; (5) that decedent stood on both sides of the transaction; (6) decedent's failure to retain sufficient assets outside of MFLP; and (7) the stated reason for MFLP's formation.

The estate argues that decedent's transfers to MFLP were bona fide sales for adequate and full consideration. The estate contends that there were legitimate and substantial nontax business reasons for the creation of MFLP, including asset protection, succession of management, centralized management, and continuation of the family's investment strategy. The estate points out that the securities were actually transferred to MFLP and never commingled with decedent's personal assets, and partnership formalities were satisfied. We will analyze each contribution separately.

A.  April 2002 Contributions

We agree with the estate that decedent's April 2002 transfers to MFLP satisfy the bona fide sale for adequate and full consideration exception and are not governed by section 2036.  Decedent had legitimate and substantial nontax business reasons for forming MFLP and for contributing securities in April 2002.  See Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74; Estate of Schutt v. Commissioner, T.C. Memo. 2005-126.  Decedent established and funded MFLP to ensure that her assets continued to be managed according to Mr. Miller's investment philosophy.

Mr. Price, Virgil G., and Donald all testified credibly about Mr. Miller's investment strategy.  Mr. Price specifically testified that Mr. Miller had been charting stocks by hand since the beginning of their business relationship and would often bring detailed records with him when the two met.  We find credible the witnesses' testimony that the driving force behind decedent's desire to form MFLP was to continue the management of family assets in accordance with Mr. Miller's investment strategy.

MFLP did not hold investments passively, collecting dividends and interest.  See Estate of Gore v. Commissioner, T.C. Memo. 2007-169; Estate of Rosen v. Commissioner, T.C. Memo. 2006-115.  Virgil G. testified that he spent about 40 hours per week

managing MFLP's assets, and we find his testimony credible. Before contribution, the assets in decedent's trust accounts were not regularly traded. However, Virgil G. began monitoring and trading the assets regularly once they were contributed to MFLP. Although MFLP earned income monthly from these sources, Virgil G. also evaluated stocks daily. See Estate of Schutt v. Commissioner, supra (family limited partnership had a significant nontax purpose of facilitating the decedent's buy and hold investment strategy and assuaging his worry that his heirs would sell his investments after his death); cf. Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66 ("There are no special skills * * * when adhering to a 'buy and hold' strategy, especially when one pays an investment adviser to recommend what to buy and when to sell.").

Virgil G. subscribed to a number of trade publications and purchased computer software to assist in his securities trading, and VGM was compensated by MFLP for management services. MFLP involved an active securities trading operation closely aligned with Mr. Miller's investment strategy. Decedent wanted her assets to be traded according to her husband's investment philosophy and set up MFLP to do just that. Virgil G. was the only family member versed in Mr. Miller's trading philosophy, and he was given authority to trade securities on behalf of MFLP.

Virgil G. also discussed MFLP with his siblings and provided financial advice.

Respondent contends that the trades MFLP actually made were not sufficient to qualify MFLP as a legitimate operation. Respondent relies on Estate of Thompson v. Commissioner, 382 F.3d 367 (3d Cir. 2004), affg. T.C. Memo. 2002-246, in support of this argument and also argues that MFLP lacked employees, kept no books or records, and had no bank accounts in its name. Respondent further contends that the types of assets transferred weigh against a finding of a valid nontax business purpose for the transfers. Respondent again points to Estate of Thompson v. Commissioner, supra, and Estate of Rosen v. Commissioner, supra, in support of his contention that there was no benefit to be derived from transfer of the assets to MFLP other than favorable estate tax treatment.

MFLP's activities need not rise to the level of a "business" under the Federal income tax laws in order for the exception under section 2036(a) to apply. See Estate of Mirowski v. Commissioner, supra; Estate of Stone v. Commissioner, T.C. Memo. 2003-309. Respondent's argument concerning the types of assets transferred fails for the same reason. The nontax purpose behind formation of MFLP was to continue Mr. Miller's investment philosophy and to apply it to family assets. This goal could not have been met had decedent not transferred securities to MFLP.

Respondent's reliance on Estate of Thompson and Estate of Rosen is misplaced. In those cases decedents transferred property that was not actively managed by family limited partnerships. See Estate of Thompson v. Commissioner, supra at 379 ("The record demonstrates that neither the Turner Partnership nor the Thompson Partnership engaged in any valid, functioning business enterprise."); Estate of Rosen v. Commissioner, supra ("For the most part, the assets of the LRFLP appear not to have been traded by the LRFLP, which, in part, explains the minimal capital gain income and loss reported by the LRFLP."). As stated above, MFLP was not a passive holder of securities.

Respondent's contentions concerning decedent's age are likewise misplaced. Respondent contends that the transfers were made because decedent and Virgil G. recognized that decedent's health was failing. Respondent argues that decedent and Virgil G. made these transfers in view of her failing health in order to reduce the value of her taxable estate. We do not agree. At the time of the April 2002 transfers, decedent, although dealing with some chronic conditions, was generally in good health. Neither decedent nor her family expected any significant decline in decedent's health in the near future.

As stated above, decedent's desire to continue her deceased husband's investment philosophy is a significant nontax business purpose. Although intrafamily transfers are subject to

heightened scrutiny, they are not barred.  See Estate of Bongard v. Commissioner, 124 T.C. at 123.  Decedent was able to ensure that her assets would be managed and invested in a manner that decedent both desired and trusted:  her deceased husband's investment strategy.

Decedent also retained sufficient assets outside of MFLP after the April 2002 contributions such that she did not need to rely on distributions from MFLP to pay for day-to-day living expenses.  Respondent's argument that decedent did not retain sufficient assets after making the transfers fails; decedent retained almost $1 million in securities in decedent's trust's Merrill Lynch and Fidelity Investments accounts and also had access to the securities in the QTIP trust after the April 2002 transfers.  Nor do we believe the use of MFLP funds to pay decedent's trust's margin accounts taints decedent's transfers. This is not an example of partnership funds being used to pay personal expenses of the decedent.  Decedent's trust purchased stock on margin; those stocks were later sold to pay the corresponding margin account.

Decedent's transfers to MFLP in April 2002 satisfy the bona fide sale exception and are therefore entitled to the claimed discount in valuing decedent's gross estate.  See Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74.  We next analyze the May 2003 contributions.

B.  <u>May 2003 Contributions</u>

We agree with respondent that decedent did not have legitimate and substantial nontax business reasons for the May 2003 transfers.  The record indicates that the driving force behind the May 2003 transfers was the precipitous decline in decedent's health in the weeks before the transfers.  The decision to make additional contributions to MFLP in May 2003 was made shortly after decedent broke her hip.  See <u>Estate of Erickson v. Commissioner</u>, T.C. Memo. 2007-107.  Although decedent was generally in good health before the April 2002 transfers, this was not the case in May 2003.  In addition to breaking her hip, decedent had just undergone pacemaker implantation surgery.  Further, decedent's rehabilitation was not progressing, and she was forced to return to the hospital with congestive heart failure.

The witnesses' testimony that decedent's family hoped for her recovery is credible, but her health was in decline.  Given the lapse in time between the April 2002 contributions and the May 2003 contributions, the decline in her health and the decision to reduce her taxable estate were clearly the driving forces behind Virgil G.'s decision to make additional contributions to MFLP.

The estate's argument that decedent contributed the remainder of her assets to MFLP in May 2003 so that they were

managed in accordance with Mr. Miller's investment strategy is undercut by the fact that decedent had the option of contributing these securities to MFLP 1 year earlier.  Had decedent wanted all of her assets managed by Virgil G. in accordance with Mr. Miller's investment strategy, there would have been no need to wait until the last weeks of her life to make additional transfers to MFLP.  The May 2003 contributions were driven by Virgil G.'s desire to reduce the value of decedent's taxable estate.  Accordingly, there was no significant nontax reason for the transfer, and the transfer does not qualify as a bona fide sale for adequate and full consideration.  See Estate of Erickson v. Commissioner, supra ("It was only after Mrs. Erickson had been admitted to the hospital with pneumonia, two days before she died, that the partners finally completed their transfers."); Estate of Rosen v. Commissioner, T.C. Memo. 2006-115 ("The fact that decedent was 88 years old and in failing health strongly supports our finding that the transfer of the assets was purely for the purpose of avoiding Federal estate and gift taxes.").

Because we find that decedent did not have a significant nontax purpose in making the May 2003 transfers, we must determine whether decedent retained the possession or enjoyment of, or the right to the income from, the property transferred to MFLP in May 2003.  Sec. 2036(a).

It is clear that when the decision was made to further fund MFLP in May 2003, Virgil G., as trustee of decedent's trust and as general partner of MFLP, knew that MFLP funds would be needed to pay decedent's estate tax liabilities. See Estate of Rector v. Commissioner, T.C. Memo. 2007-367. The May 2003 transfers were driven by Virgil G.'s desire to decrease the value of decedent's taxable estate. After this contribution, decedent did not retain sufficient assets to satisfy her estate tax liabilities. See Estate of Erickson v. Commissioner, supra; Estate of Rosen v. Commissioner, supra.

Although the estate argues that the distribution to decedent's trust in 2004 was simply a pro rata distribution to MFLP's partners, the funds were used to satisfy decedent's estate's tax liability. "[P]art of the 'possession or enjoyment' of one's assets is the assurance that they will be available to pay various debts and expenses upon one's death." Strangi v. Commissioner, 417 F.3d 468, 477 (5th Cir. 2005), affg. T.C. Memo. 2003-145. That the remaining partners of MFLP received de minimis amounts as part of the 2004 distribution serves to highlight the fact that a large amount of MFLP funds was needed to satisfy decedent's liabilities. "Where an individual conveys all or nearly all of his or her assets to a trust or partnership," Estate of Rosen v. Commissioner, supra, the likelihood that the individual will have access to the assets is

the greatest, id. Virgil G.'s use of funds distributed by MFLP to pay decedent's estate tax liability shows that the final contributions to MFLP completely depleted decedent's resources. See Strangi v. Commissioner, supra at 478; Estate of Rector v. Commissioner, supra; Estate of Rosen v. Commissioner, supra.

The estate's contention that Virgil G. would not distribute funds to decedent because to do so would violate his fiduciary duties and would be at odds with the stated goals of MFLP is not credible. It is inconceivable that had decedent recovered and faced, for example, increased day-to-day living expenses or catastrophic medical costs, Virgil G., as general partner of MFLP, would not have provided her with access to the securities used to fund MFLP.

We conclude that at the time of the May 2003 transfer to MFLP decedent retained the economic benefit of the securities transferred. See Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66; Estate of Rector v. Commissioner, supra. Accordingly, the securities transferred are not entitled to the claimed discount and must be included in the value of decedent's gross estate at their fair market value.[7]

---

[7]For purposes of valuing the securities transferred from decedent's trust's Fidelity Investments account to MFLP's Fidelity Investments account in May 2003, we find Virgil G.'s explanation for the discrepancy between the May and June 2003 account statements credible. Accordingly, those transfers will be valued according to the June 2003 statement which shows the

(continued...)

IV.  Conclusion

Decedent's estate is increased by the amounts used to fund the QTIP trust.  Decedent's estate is entitled to the claimed discount for the securities transferred to MFLP in April 2002. Decedent's estate is not entitled to the claimed discount for the securities transferred to MFLP in May 2003.  The parties' agreement as to taxes and any deduction for legal fees will be dealt with in the Rule 155 computation.

Accordingly,

Decision will be entered

under Rule 155.

---

[7](...continued)
transfers being made as of May 15, 2003.