# United States Tax Court

CORRECTED
T.C. Memo. 2024-90

ESTATE OF ANNE MILNER FIELDS, DECEASED, BRYAN K.
MILNER, EXECUTOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 1285-20.                              Filed September 26, 2024.

————

*David C. Gair*, *Norman Arthur Lofgren*, *George Tomas Rhodus*, and *Joshua D. Smeltzer*, for petitioner.

*Vivian Bodey*, *Courtney M. Hill*, *Sharmeen Ladhani*, *Audrey Marie Morris*, *Billi Seale*, and *Amy Dyar Seals*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: Anne Milner Fields inherited an oil business when her husband passed away in the 1960s. She ran that business well and, over time, became a successful businessperson. She took a particular interest in her great nephew, Bryan Milner, educating him, mentoring him, and designating him as the successor to her wealth. In her later years she relied on Mr. Milner to take care of her and manage her assets, entrusting him with a comprehensive durable power of attorney. This case arises from an estate plan that Mr. Milner, using the power of attorney, implemented about a month before Ms. Fields's death on June 23, 2016.

On May 20, 2016, Mr. Milner formed AM Fields Management, LLC (AM Fields Management), of which he was the sole member and manager. He then formed AM Fields, LP (AM Fields) on May 26, 2016,

**[\*2]** for which AM Fields Management was the general partner and Ms. Fields was the limited partner. In forming AM Fields, Mr. Milner acted on behalf of both the general and limited partners. That is, he signed the partnership agreement both as the manager of AM Fields Management and as Ms. Fields's agent. Afterwards, he used his power of attorney to transfer to AM Fields approximately $17 million of Ms. Fields's personal assets (constituting most of her wealth). He also caused AM Fields Management to contribute $1,000 to AM Fields. In exchange for the contributions, Ms. Fields received a 99.9941% limited partner interest in AM Fields, and AM Fields Management received a 0.0059% general partner interest.

After Ms. Fields passed away, Mr. Milner got an appraisal of Ms. Fields's limited partner interest in AM Fields. The appraiser valued the interest at about $10.8 million as of Ms. Fields's date of death, reflecting the approximately $17 million in contributed assets less a 15% discount for lack of control and a 25% discount for lack of marketability. Mr. Milner, as executor for the Estate of Anne Milner Fields (Estate), reported this discounted value on the Estate's federal estate tax return.

The Internal Revenue Service (IRS) audited the return and found the estate plan suspect. In a Notice of Deficiency the Commissioner determined that section 2036(a)[1] applies such that the gross estate includes the full date-of-death value of Ms. Fields's assets that were contributed to AM Fields.[2] As an alternative, the Commissioner determined that the Estate undervalued Ms. Fields's limited partner interest and that the interest was worth $15,388,000. He also determined a penalty under section 6662(a) and (b)(5) for an underpayment attributable to a substantial estate tax valuation understatement or, as an alternative, a penalty under section 6662(a) and (b)(1) for an underpayment attributable to negligence or disregard of rules or regulations.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The Estate did not elect the alternate valuation date under section 2032(a).

**[\*3]**    The Commissioner has since conceded that the Estate is not liable for the penalty under section 6662(a) and (b)(5). We are therefore left to decide:

1.    Whether section 2036(a) includes within the gross estate the date-of-death value of the assets Ms. Fields contributed to AM Fields in excess of the value of Ms. Fields's 99.9941% limited partner interest in AM Fields;

2.    If not, what the date-of-death fair market value was of Ms. Fields's limited partner interest; and

3.    Whether the Estate is liable for an accuracy-related penalty under section 6662(a) and (b)(1).

FINDINGS OF FACT

Ms. Fields resided in Texas on the date of her death. Mr. Milner, the Estate's executor, resided in Texas when the Petition in this case was timely filed.

I.    *The Milner Fields Family*

A.    *Anne Milner Fields*

Ms. Fields was born in the small town of Winnsboro, Texas. After graduating from high school, she moved to Dallas, Texas, where she worked as a secretary and eventually met Bert Fields, Sr., an oil businessman, whom she later married. Ms. Fields lived the life of a socialite during her marriage to Mr. Fields. She did not have any children before or during her marriage to Mr. Fields.

Mr. Fields passed away in 1963, leaving Ms. Fields with the family business. Ms. Fields had no experience running a business, and she realized that keeping the family enterprise successful would require a personal transformation on her part. She subsequently replaced her socialite lifestyle with business training. She enrolled in accounting and business classes at Southern Methodist University (SMU). She asked business partners and advisers to help her learn the various aspects of the oil business. Ms. Fields's approach ultimately served her well: Her schooling, charisma, drive, and curiosity yielded good business decisions, which over time compounded into considerable personal wealth. She did not remarry or have children after Mr. Fields's passing.

[*4]  B.  *Bryan Milner*

Mr. Milner is Ms. Fields's great nephew, in whom Ms. Fields took a particular interest.  She paid for his bachelor's degree in finance from the University of North Texas and his master's degree in business administration from SMU.  She also mentored him throughout her life.  At the time of trial Mr. Milner worked as a commercial banker with Texas Capital Bank.  He had previously worked at Wells Fargo Bank for 17 years, focusing on asset-based commercial lending.

II.  *Ms. Fields's Will and Power of Attorney*

On January 29, 2010, Ms. Fields personally signed a last will and testament (will), a statutory durable power of attorney (general POA), and a medical power of attorney (medical POA).  The relevant portions of each document are described in turn below.

The will appointed Mr. Milner the executor of the Estate.  It provided for 11 specific bequests, all but one of which were cash bequests.  Three of the ten specific cash bequests were charitable bequests to the following entities:

| Entity | Amount of Charitable Bequest |
|---|---|
| The Tinney Chapel Methodist Church, Winnsboro, Texas | $50,000 |
| The First Methodist Church, Winnsboro, Texas | 200,000 |
| The Winnsboro, Texas ISD High School | 100,000 |

Other specific bequests were to family members and friends.  The total amount of the cash bequests was $1,450,000, while the noncash bequest comprised 6,000 shares of North Dallas Bank & Trust (NDBT) stock.  Ms. Fields bequeathed the remainder of her estate to Mr. Milner.

The general POA resembled the form power of attorney provided in Texas Probate Code Annotated § 490 (West 2010) (repealed 2014).  The document appointed Mr. Milner to act as Ms. Fields's agent and attorney-in-fact.  It further appointed Susan Milner, Ms. Fields's great niece, as the first alternate agent and Ms. Milner's sister as the second alternate agent.  Ms. Fields did not restrict any of the powers provided for in the general POA.  She elected to give Mr. Milner the power to make gifts, provided they did not exceed "the amount of annual exclusions allowed from the federal gift tax for the calendar year of the

[*5] gift." She also elected to have the general POA go into effect upon her disability or incapacity. The general POA further stated that Ms. Fields

> shall be considered disabled or incapacitated for purposes of this [general POA] if a physician certifies in writing at a date later than the date this power of attorney is executed that, based on the physician's medical examination of me, I am mentally incapable of managing my financial affairs.

Likewise, the medical POA designated Mr. Milner as Ms. Fields's agent to make healthcare decisions for her should she be unable to do so (and should a physician certify in writing that she was so unable). Ms. Milner and her sister were designated the first and second alternate agents, respectively. There were no restrictions on the medical POA. Both the general and medical POAs were validly executed under Texas law.

III. *Events Leading to the Formation of AM Fields and AM Fields Management*

   A. *Ms. Fields's Health Before the Formation of AM Fields*

Ms. Fields was diagnosed with Alzheimer's dementia (Alzheimer's) in early 2011. Several months later, when out at dinner with Mr. Milner and Ms. Milner, Ms. Fields fell and broke her hip. She had surgery to repair the hip, followed by stays at two rehabilitation centers. Mr. Milner soon after placed Ms. Fields in a long-term care facility focusing on the memory-impaired, run by the company Silverado (Silverado home).

Mr. Milner strived to make Ms. Fields as comfortable as possible at the Silverado home. He rented two adjacent rooms and, through Silverado, hired caregivers to provide Ms. Fields with round-the-clock care. Despite those efforts, Ms. Fields did not enjoy living at the Silverado home and would routinely express to Mr. Milner her dissatisfaction with her quarters and her neighbors. The last straw for Mr. Milner came when Ms. Fields fell while unsupervised during a shift change between her various caregivers.

Mr. Milner discovered that a house across the street from his own home was listed for sale (Covehaven property). He planned to purchase that house for Ms. Fields, remodel it to look similar to her old

**[\*6]** house,[3] move her in, and hire caregivers to provide round-the-clock care under his close supervision. While the Covehaven property was in escrow, it became unclear whether Mr. Milner had the authority to act on Ms. Fields's behalf in the home purchase and other financial matters. Thus, Mr. Milner obtained letters from two of Ms. Fields's physicians: Dr. Alfredo Garcia and Dr. Vaqar Dar. Both letters are dated April 20, 2012. Dr. Garcia's letter stated that, in his medical opinion, Ms. Fields had the requisite mental capacity to understand the meaning and significance of the general POA when she signed it on January 29, 2010. Dr. Dar's letter stated that, in his medical opinion, as of April 20, 2012, Ms. Fields was "not capable of appreciating the meaning or significance of the [purchase of the Covehaven property], or of handling her legal and financial affairs," thereby satisfying the condition precedent for the general POA to take effect. Subsequently Mr. Milner, as Ms. Fields's agent, used her assets to purchase the Covehaven property and title it in her name. Ms. Fields moved in after the remodeling, and Mr. Milner hired three caregivers.

### B.    *Financial Elder Abuse*

Ms. Fields was a victim of two instances of financial elder abuse. The first came to light in August 2011, after Ms. Fields had hip surgery and was recovering at a rehabilitation center. Mr. Milner visited Ms. Fields's house to check her answering machine and heard multiple suspicious messages from a man unfamiliar to him. After investigating, he discovered that the man was part of a home repair scam and that, over the course of several months, the man had duped Ms. Fields out of approximately $20,000. Mr. Milner filed a report with the Dallas Police Department. (The record does not indicate what happened after the report was filed.)

The second instance of abuse occurred after Ms. Fields moved into the Covehaven property. Mr. Milner gave Ms. Fields's caregivers a debit card so they could purchase necessities like groceries and gas in connection with her care. Upon checking the receipts, Mr. Milner discovered that one of the caregivers was routinely requesting $20, $30, or $50 in "cash back" when shopping in grocery stores. He warned the caregiver that he would fire her if she embezzled from Ms. Fields again. He also started leaving only small amounts of cash in the bank account

---

[3] Mr. Milner did so because he had learned that people with Alzheimer's tend to cope better with the disease when they live in familiar surroundings.

[*7] linked to the debit card, and he set alerts to inform him by text message every time the card was used.

C.     *Formation of AMF Capital, LLC, and Winnsboro Capital, LLC*

Mr. Milner was friends with John Mongogna. In 2015 and 2016 Mr. Mongogna worked as a business litigation and transaction attorney for the law firm of Coats Rose. Mr. Milner routinely asked Mr. Mongogna, as a friend, for his advice on different legal issues, and from time to time he retained Mr. Mongogna as his attorney on various legal matters.

In 2015 Mr. Milner approached Mr. Mongogna about certain investments that he wanted to make using Ms. Fields's assets. Mr. Mongogna believed that it was best practice to keep certain types of investments in a limited liability company (LLC), to take advantage of statutory liability protections. If something went wrong with an investment, any liability generally would be limited to the LLC's assets, keeping the personal assets of the LLC's members safe and out of reach of creditors. However, Mr. Mongogna did not believe that an LLC necessarily would resolve the problem of a third party's refusing to honor a general POA.

On the advice of Mr. Mongogna, Mr. Milner formed two LLCs in May 2015: AMF Capital, LLC (AMF Capital), and Winnsboro Capital, LLC (Winnsboro Capital). Ms. Fields, who was the sole member of both LLCs, did not personally sign the company agreements; rather, Mr. Milner signed those agreements for her as her agent. Mr. Milner also signed each company agreement on his own behalf as LLC manager. At the time of Ms. Fields's death, AMF Capital held three assets: cash, notes receivable, and collectible guitars;[4] Winnsboro Capital held real estate in Winnsboro, Texas.

---

[4] The notes receivable consisted of loans AMF Capital made to Mr. Milner, other members of the Milner Fields family, and third parties. AMF Capital owned at least six guitars, including a 1957 Fender Stratocaster, a 1958 Fender Stratocaster, a 1958 Gibson SJ, a 1958 Les Paul Special TV, a 1960 Gibson Les Paul, and a 1963 Fender Stratocaster.

**[*8]** IV.    *Formation of AM Fields and AM Fields Management*

A.    *Formation*

On or about May 11, 2016, Mr. Milner approached Mr. Mongogna to discuss estate planning for Ms. Fields. Mr. Mongogna was not an estate planning attorney and so referred Mr. Milner to his colleague at Coats Rose, Jamie Katzen. Following a meeting with Mr. Milner, Mr. Katzen began drafting a company agreement for AM Fields Management, a partnership agreement for AM Fields, and a certificate of formation for each entity. Mr. Katzen also suggested that Mr. Milner retain the business valuation firm of Katzen Marshall to appraise AM Fields's assets. Mr. Milner retained Katzen Marshall on or about May 20, 2016.

Also on May 20, 2016, Mr. Katzen's office filed a certificate of formation for AM Fields Management with the Texas secretary of state. Three days later, on May 23, 2016, Mr. Katzen sent an email to David Katzen (a partner at Katzen Marshall),[5] attaching a draft of the partnership and company agreements for AM Fields and AM Fields Management, respectively, and asking David Katzen for "any comments [he might have] . . . regarding the terms that might be useful in obtaining a deeper discount." The record does not reflect whether or how David Katzen replied to that email.

On or about May 25, 2016, Mr. Milner executed the company agreement for AM Fields Management. Under that agreement, Mr. Milner was the company's sole member and sole manager, and he signed the agreement in both capacities. The agreement provided that Mr. Milner would contribute $1,000 to the company in exchange for a 100% interest.

Also on or about May 25, 2016, Mr. Milner executed the limited partnership agreement for AM Fields (partnership agreement). Under the partnership agreement, AM Fields Management was the partnership's general partner and Ms. Fields its sole limited partner. Section 5 of the partnership agreement, titled "Management," provided that subject to certain enumerated restrictions not relevant here, the general partner "shall have the sole and exclusive right to manage the business of [AM Fields]." Section 3.1, titled "Profits," generally provided that profits for each fiscal year "shall be allocated to the Partners in

---

[5] David Katzen is Jamie Katzen's father.

[*9] proportion to their respective Percentage Interests." Section 4, titled "Distributions," generally provided that the general partner had absolute discretion to distribute cash "to the Partners in proportion to their respective Percentage Interests." Section 13, titled "Dissolution and Winding Up," provided that the partnership would dissolve and wind up upon (among other things) "[t]he affirmative vote of all the Partners." Section 13 also provided that in the event the partnership was wound up, partnership property would be liquidated and the proceeds first used to pay the partnership's debts and liabilities to third parties, then used to pay the partnership's debts and liabilities to the partners, and finally distributed to the partners in accordance with their respective capital accounts.

The partnership agreement further provided that AM Fields Management would contribute $1,000 to the partnership in exchange for a "0.0069%"[6] interest and that Ms. Fields would contribute $16,972,409 to the partnership in exchange for a 99.9941% interest. Mr. Milner signed the partnership agreement both in his role as manager of AM Fields Management and on Ms. Fields's behalf, as her agent. Further, as manager of AM Fields Management, he executed a certificate of formation for AM Fields, which was filed with the Texas secretary of state on May 26, 2016.

### B. *Contributions to AM Fields*

Following the formation of AM Fields and AM Fields Management, AM Fields Management contributed $1,000 to AM Fields in exchange for its general partner interest. On May 27, 2016, Mr. Milner executed a bill of sale and assignment (bill of sale). The bill of sale listed Ms. Fields as the seller of certain assets and AM Fields as the purchaser. Mr. Milner signed the bill of sale both for the seller (as Ms. Fields's agent) and for the buyer (as manager of AM Fields Management). Exhibit A to the bill of sale, titled "Legal Description of Property," lists the following:

---

[6] Although Exhibit A of the partnership agreement states that AM Fields Management would receive a 0.0069% interest in exchange for a $1,000 contribution, that percentage is a scrivener's error, as 99.9941% + 0.0069% = 100.001%. The total amount contributed to AM Fields was $16,973,409, and the partnership agreement stated that each partner would receive an interest proportionate to its contribution. Thus, AM Fields Management in fact received a 0.0059% interest: $1,000 ÷ $16,973,409 = 0.0059%.

[*10] 1) Ten Million ($10,000,000) of the assets held at that certain Brokerage Account held at Wells Fargo Bank in my name.
2) All of my shares, being approximately Eighty-Nine Thousand (89,000), of stock of North Dallas Bank and Trust, having an approximate value of Five Million Three Hundred Forty Thousand Dollars ($5,340,000).
3) All my interest in the Tree Farm being approximately Three Hundred Fifty (350) acres of real property located in Wood County, Texas, and having an approximate value of One Million One Hundred Four Thousand Seven Hundred Twenty Dollars ($1,104,720).
4) All of my interest in AMF Capital, LLC, a Texas limited liability company[.]
5) All of my interest in Winnsboro, LLC [sic], a Texas limited liability company[.]

The tree farm was transferred by general warranty deed executed on May 27, 2016, by Mr. Milner as Ms. Fields's agent. Ms. Fields's interests in AMF Capital and Winnsboro Capital were also transferred on that date by two separate assignments of membership interest, executed by Mr. Milner both as Ms. Fields's agent (Ms. Fields was the assignor) and as manager of AM Fields Management (AM Fields was the assignee). Ms. Fields's 89,093 shares of NDBT stock were transferred to AM Fields on June 6, 2016, when Mr. Milner executed a transfer request form. And the Wells Fargo brokerage account was transferred to AM Fields on June 13, 2016, when Mr. Milner executed a securities and cash transfer form. Mr. Milner acted as Ms. Fields's agent when he executed the forms that transferred the NDBT shares and the Wells Fargo brokerage account to AM Fields.

Ms. Fields received a 99.9941% limited partner interest in AM Fields in exchange for the five assets. Following the transfers, her assets remaining outside the partnership totaled approximately $2,152,508, consisting of $1,530,262 in liquid assets, $495,000 in real estate (the Covehaven property), and $127,246 in other illiquid assets.

C.    *Ms. Fields's Health in May and June 2016*

Sometime during the week of May 2, 2016, Ms. Fields fell in the presence of one of her caregivers. That caregiver scheduled an appointment for Ms. Fields with Dr. Garcia on May 13, 2016. On May 21, 2016, Ms. Fields fainted and was sent to the hospital, where she was

[*11] found to have suffered from a heart attack and a spine fracture. She was 91 years old at the time. Ms. Fields was discharged from the hospital on May 25, 2016. About two weeks later, on June 9, 2016, she had a followup visit with Dr. Garcia, who noted Ms. Fields's continuing dementia, weak condition, and need for "total care." He gave his impression that Ms. Fields's Alzheimer's was "end-stage." Six days later, on June 15, 2016, Dr. Garcia issued Ms. Fields a prescription for hospice care. He also signed a Physician Certification of Terminal Illness, which certified to the Texas Medicaid Hospice Program of the Texas Department of Aging and Disability Services that Ms. Fields had an illness "with a medical prognosis of six months or less to live, if the illness runs its normal course." Ms. Fields died eight days later, on June 23, 2016.

## V. *Events Occurring After Ms. Fields's Death*

### A. *Probate Action*

After Ms. Fields died, Mr. Milner initiated a probate action with Probate Court No. 1 of Collin County, Texas. That court subsequently issued an order admitting Ms. Fields's will to probate, appointing Mr. Milner as executor, and authorizing the issuance of letters testamentary.

As stated above, Ms. Fields's will provided for ten specific cash bequests totaling $1,450,000 and one noncash bequest of 6,000 shares of NDBT stock.[7] Since the Estate did not have enough cash to pay all the cash bequests, in December 2017 Mr. Milner distributed $600,000 and 1,200 shares of NDBT stock from AM Fields to the Estate. He then wrote a check to the Tinney Chapel Methodist Church for $50,000, a check to the Winnsboro, Texas ISD High School for $100,000, and a check to the First Methodist Church for $140,000. He also assigned the 1,200 shares of NDBT stock to the First Methodist Church.

### B. *Estate Tax Return*

Mr. Milner retained the accounting firm of Armanino LLP (Armanino) to prepare the Estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. Jerri Hammer, a partner at Armanino, was the primary estate tax return preparer. At the time she was both a certified public accountant and an attorney. Both Mr.

---

[7] The legatee of the noncash bequest predeceased Ms. Fields and the bequest therefore lapsed.

[*12] Milner and Ms. Hammer signed the estate tax return, which was timely filed on March 21, 2017.

On that return, the Estate included in the gross estate Ms. Fields's limited partner interest in AM Fields, valued at $10,877,000. The Estate did not include, independently of the limited partner interest, any value of Ms. Fields's assets transferred to AM Fields. The Estate calculated an estate tax liability of $4,617,800, which it did not have enough cash to pay. Thus, Mr. Milner sold some of AM Fields's marketable securities and distributed the cash proceeds from AM Fields to the Estate, which then paid the reported tax liability.

## OPINION

I.    *Burden of Proof and Witness Credibility*

Generally, we presume that the IRS's determinations in a notice of deficiency are correct, and the taxpayer bears the burden of proving those determinations incorrect. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).[8]

As the Estate correctly noted in its posttrial briefs, witness credibility is an essential part of this case, which turns on Mr. Milner's motives for forming and funding AM Fields. As the trier of fact, we may credit testimony in full, in part, or not at all. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). We decide whether a witness' testimony is credible by relying on objective facts, the reasonableness of the testimony, the consistency of the witness' statements, and the witness' demeanor. *See Quock Ting v. United States*, 140 U.S. 417, 420–21 (1891); *Wood v. Commissioner*, 338 F.2d 602, 605 (9th Cir. 1964), *aff'g* 41 T.C. 593 (1964); *Pinder v. United States*, 330 F.2d 119, 124–25 (5th Cir. 1964); *Concord Consumers Hous. Coop. v. Commissioner*, 89 T.C. 105, 124 n.21 (1987). We may discount testimony that we find unworthy of belief, *see Tokarski v. Commissioner*, 87 T.C. 74, 77 (1968), but we may not arbitrarily disregard testimony that is competent, relevant, and uncontradicted, *see Conti v.*

---

[8] Under section 7491(a), the burden of proof shifts to the Commissioner with respect to a factual issue where the taxpayer (1) produced credible evidence regarding that issue, (2) complied with the Code's substantiation and recordkeeping requirements, and (3) complied with the IRS with regard to all reasonable requests for information. *See also Higbee v. Commissioner*, 116 T.C. 438, 440–41 (2001). The Estate does not contend that section 7491(a) applies, and the record does not otherwise indicate that it should.

**[\*13]** *Commissioner*, 39 F.3d 658, 664 (6th Cir. 1994), *aff'g and remanding* 99 T.C. 370 (1992) *and* T.C. Memo. 1992-616.

II.    *Legal Principles*

The federal estate tax is imposed on the transfer of a decedent's taxable estate.  I.R.C. § 2001(a).  The taxable estate's value is the value of the gross estate after applicable deductions.  I.R.C. § 2051.  The value of the gross estate generally includes the fair market value of all property that the decedent owned on the date of death or that is otherwise included in the gross estate under the Code.  *See* I.R.C. §§ 2031, 2033–2046; Treas. Reg. § 20.2031-1.

If a decedent made an inter vivos transfer of property (other than a bona fide sale for adequate and full consideration) and retained specific rights or interests in the property that were not relinquished until death, the full value of the transferred property generally is included in the gross estate.  I.R.C. § 2036(a).[9]  The purpose of section 2036(a) is to include in the gross estate inter vivos transfers that were testamentary in nature.  *Estate of Bongard v. Commissioner*, 124 T.C. 95, 112 (2005) (citing *United States v. Estate of Grace*, 395 U.S. 316 (1969)).

There are three requirements for property to be included in the gross estate under section 2036(a).  First, the decedent must have made an inter vivos transfer of property.  Second, the decedent must have retained an interest or a right specified in section 2036(a)(1) or (2) in the transferred property that he or she did not relinquish until death.  Finally, the transfer must not have been a bona fide sale for adequate and full consideration.  *Estate of Bongard*, 124 T.C. at 112.

---

[9] Sec. 2036. Transfers with retained life estate.

(a) General Rule.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in the case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

**[\*14]** III.    *Whether Section 2036(a) Requires Inclusion of the Underlying AM Fields Asset Values in Excess of the Partnership Interest Value*

The parties do not dispute that the first condition—an inter vivos transfer of property—occurred here: Mr. Milner, on Ms. Fields's behalf, contributed five of Ms. Fields's assets to AM Fields between May 27 and June 13, 2016.  We therefore consider whether Ms. Fields retained applicable rights or interests in the property she transferred.  If she did, we then must consider whether her transfers meet the exception for bona fide sales for adequate and full consideration.

A.    *Whether Ms. Fields Retained Applicable Rights or Interests in the Transferred Property*

Transferred property may be included in the gross estate if the decedent retained possession or enjoyment of, or the right to income from, the property.  I.R.C. § 2036(a)(1).  For these purposes, a transferor retains "possession or enjoyment" if she retains a "substantial present economic benefit" from the property, as opposed to "a speculative contingent benefit which may or may not be realized."  *Strangi v. Commissioner*, 417 F.3d 468, 476 (5th Cir. 2005) (quoting *United States v. Byrum*, 408 U.S. 125, 145, 150 (1972)), *aff'g Estate of Strangi v. Commissioner*, T.C. Memo. 2003-145, 85 T.C.M. (CCH) 1331.  Possession or enjoyment is "retained" for these purposes if there is an express or implied agreement among the parties to that effect at the time of the transfer, whether or not the agreement is legally enforceable.  *Strangi v. Commissioner*, 417 F.3d at 476; *Estate of Strangi*, 85 T.C.M. (CCH) at 1336; *see also* Treas. Reg. § 20.2036-1(c)(1)(i).

Although the partnership agreement gave AM Fields Management some rights to the income and underlying property of AM Fields,[10] it acquired those rights in exchange for a $1,000 contribution that yielded a merely de minimis interest.  That interest was "hardly more than a token in nature. . . . Accordingly, we direct our attention to the purpose, as opposed to the mechanics, of partnership distributions

---

[10] Section 3.1 of the partnership agreement generally provided that profits for each fiscal year "shall be allocated to the Partners in proportion to their respective Percentage Interests," and Section 13 provided that upon dissolution of the partnership and after payment of debts, partnership property would be distributed to the partners in accordance with their capital accounts.

[*15] and expenditures." *Estate of Strangi*, 85 T.C.M. (CCH) at 1338. As explained below, that purpose was testamentary in nature.

AM Fields Management was the general partner at all times, with absolute discretion to make proportionate distributions; Mr. Milner was its sole member and manager; and both before and throughout his tenure as manager he acted as Ms. Fields's agent under the general POA. Therefore, at all times Ms. Fields effectively held the right to virtually all the income from her transferred assets, and the AM Fields partnership agreement constituted an express agreement to that effect. *See id.* at 1337 (holding that the decedent retained the right to income from property transferred to a family limited partnership in exchange for a 99% partnership interest, where the general partner was managed by the decedent's attorney-in-fact). Although Ms. Fields did not actually receive any income distributions from AM Fields during life, we have clarified before that section 2036(a)(1) "does not require that the transferor pull the 'string' or even intend to pull the string on the transferred property; it only requires that the string exist." *Estate of Pardee v. Commissioner*, 49 T.C. 140, 148 (1967).

We also conclude that Ms. Fields retained enjoyment (i.e., substantial present economic benefit) of the five transferred assets themselves. The AM Fields transfers left Ms. Fields with only $2.15 million of assets outside the partnership, while her will listed bequests of $1.45 million, and a substantial estate tax liability was foreseeable. On this basis, we find an implicit agreement between Mr. Milner and Ms. Fields that he, as manager of AM Fields's general partner, would make distributions from the partnership to satisfy her expenses, debts, and bequests if and when necessary. *See Estate of Bongard*, 124 T.C. at 129 ("The existence of an implied agreement is a question of fact that can be inferred from the circumstances surrounding a transfer of property and the subsequent use of the transferred property."). Mr. Milner did in fact make distributions to satisfy Ms. Fields's bequests and the Estate's estate tax liability. "[P]art of the 'possession or enjoyment' of one's assets is the assurance that they will be available to pay various debts and expenses upon one's death." *Estate of Strangi v. Commissioner*, 417 F.3d at 477. The use of a significant portion of partnership assets to discharge obligations of a decedent's estate is evidence of a retained interest in the assets transferred to the partnership. *Estate of Liljestrand v. Commissioner*, T.C. Memo. 2011-259, 102 T.C.M. (CCH) 440, 448; *Estate of Jorgenson v. Commissioner*, T.C. Memo. 2009-66, 97 T.C.M. (CCH) 1328, 1337, *aff'd*, 431 F. App'x 544 (9th Cir. 2011). As we remarked in an analogous case: "[V]irtually

**[\*16]** nothing beyond formal title changed in decedent's relationship to [her] assets." *Estate of Strangi*, 85 T.C.M. (CCH) at 1339.

In addition to retaining enjoyment and rights under section 2036(a)(1), Ms. Fields also retained "the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the [transferred] property or the income therefrom." I.R.C. § 2036(a)(2). Section 13.1(a) of the partnership agreement provided that Ms. Fields had the right, in conjunction with Mr. Milner, to dissolve the partnership, upon which Mr. Milner would be obligated to liquidate all partnership property, pay off partnership debts, and distribute cash to the partners in accordance with their capital accounts. Accordingly, Ms. Fields retained the right—in conjunction with Mr. Milner—to at any time acquire outright all income from the transferred assets and then designate its disposition. *See Estate of Powell v. Commissioner*, 148 T.C. 392, 402 (2017) (holding that the decedent's ability, along with other others, to dissolve a family limited partnership in which he was a 99% limited partner "is sufficient to invoke section 2036(a)(2)"); *Estate of Strangi*, 85 T.C.M. (CCH) at 1341–43 (same). We emphasize that here there was essentially no pooling of assets in the partnership, which accordingly functioned not as a joint investment vehicle but rather only as a vehicle to reduce estate tax.

We therefore hold that up until her death Ms. Fields retained the enjoyment of the five transferred assets as well as the right to the income from those assets and the right to designate who should possess or enjoy that income.

B.     *Whether the Transfers Were a Bona Fide Sale for Adequate and Full Consideration*

Section 2036(a) contains a carveout for transfers constituting a "bona fide sale for an adequate and full consideration in money or money's worth." Whether a transfer is a bona fide sale is a question of motive, and whether a transfer is for adequate and full consideration is a question of value. *See Estate of Bongard*, 124 T.C. at 117–18; *Estate of Moore v. Commissioner*, T.C. Memo. 2020-40, at \*30, *aff'd*, No. 20-73013, 2021 U.S. App. LEXIS 33111 (9th Cir. Nov. 8, 2021). Here Ms.

**[\*17]** Fields received adequate and full consideration, so the case hinges on whether there was a bona fide sale.[11]

Regarding whether Ms. Fields's transfers to AM Fields were bona fide, "the proper inquiry is whether the transfer in question was objectively likely to serve a substantial nontax purpose. Thus, the finder of fact is charged with making an objective determination as to what, if any, nontax business purposes the transfer was reasonably likely to serve at its inception." *Strangi v. Commissioner*, 417 F.3d at 479–80 (footnote omitted). "The objective evidence must indicate that the nontax reason was a significant factor that motivated the [family limited] partnership's creation. A significant purpose must be an actual motivation, not a theoretical justification." *Estate of Bongard*, 124 T.C. at 118 (citations omitted). In gauging the bona fides of a sale or other exchange, we may consider the decedent's age and health at the time of the transfer. *See, e.g.*, *Estate of Miller v. Commissioner*, T.C. Memo. 2009-119, 97 T.C.M. (CCH) 1602, 1610 (concluding that a second set of inter vivos transfers was not a bona fide sale for adequate and full consideration because the transfers were executed just before the decedent's precipitous decline in health); *Estate of Erickson v. Commissioner*, T.C. Memo. 2007-107, 93 T.C.M. (CCH) 1175, 1182 ("Mrs. Erickson's age and health at the time of the transaction strongly indicate that the transfers were made to avoid estate tax.").

---

[11] Whether a transfer to a partnership in exchange for a partnership interest was made for adequate and full consideration depends on

> (1) whether the interests credited to each of the partners was proportionate to the fair market value of the assets each partner contributed to the partnership, (2) whether the assets contributed by each partner to the partnership were properly credited to the respective capital accounts of the partners, and (3) whether on termination or dissolution of the partnership the partners were entitled to distributions from the partnership in amounts equal to their respective capital accounts.

*Kimbell v. United States*, 371 F.3d 257, 266 (5th Cir. 2004). All three of these requirements were met here. AM Fields Management and Ms. Fields received partnership interests proportionate to their contributions to the partnership. The contributions of both partners were properly credited to their respective capital accounts. And the partnership agreement provided that upon termination or dissolution and after payment of partnership debts, the partners would receive distributions in accordance with their respective capital accounts. We therefore conclude that Ms. Fields received adequate and full consideration for her contribution of the five assets to AM Fields.

[*18]  The Estate alleges that there were four significant and legitimate nontax purposes for Ms. Fields's contributions to AM Fields:

1. AM Fields protected Ms. Fields from further instances of financial elder abuse.
2. AM Fields allowed for "succession management of assets," i.e., Mr. Milner would be able to choose his successor to manage AM Fields (whereas he could not choose his successor under the general POA).
3. AM Fields resolved the problem of third parties, such as banks, refusing to honor the general POA.
4. AM Fields allowed for consolidated and streamlined management of assets.

In support of these four reasons, the Estate relies on some documents in the record but largely on Mr. Milner's testimony.

While we found Mr. Milner to have been sincere in his desire to care and provide for Ms. Fields, we do not find credible Mr. Milner's testimony that he was actually motivated to contribute Ms. Fields's assets to AM Fields in order to achieve any of the above four goals, especially given Ms. Fields's age and health at the time of the contributions.  The following timeline juxtaposes the AM Fields transactions with Ms. Fields's declining health:

**[\*19]**



Week of May 2, 2016
Ms. Fields falls in the presence of a caregiver.

May 13, 2016
Ms. Fields visits Dr. Garcia.

May 11, 2016
Mr. Milner approaches Mr. Mongogna about estate planning for Ms. Fields.

May 20, 2016
Certificate of formation for AM Fields Management filed with the Texas Secretary of State.

May 21–25, 2016
Ms. Fields is hospitalized due to a heart attack, among other health issues.

May 25, 2016
Mr. Milner executes company and partnership agreements for AM Fields Management and AM Fields, respectively.

May 26, 2016
Certificate of formation for AM Fields filed with the Texas Secretary of State.

May 27, 2016
Mr. Milner executes the bill of sale and effects transfers of the tree farm, AMF Capital, and Winnsboro Capital.

June 9, 2016
Dr. Garcia examines Ms. Fields during a posthospitalization visit. He notes that Ms. Fields has end-stage Alzheimer's and recommends hospice care.

June 6, 2016
Mr. Milner effects transfer of the NDBT shares, the second largest asset contributed.

June 13, 2016
Mr. Milner effects transfer of the Wells Fargo brokerage account, by far the largest asset contributed.

June 15, 2016
Ms. Fields is placed in hospice care.

June 23, 2016
Ms. Fields dies.

This timeline casts significant doubt on Mr. Milner's avowal that he was actually motivated to undertake the AM Fields transactions for any reason other than reducing estate tax (by virtue of obtaining a discount on Ms. Fields's partnership interest for lack of control and lack of marketability). More generally, the following facts are troublesome:

  1.     There is no evidence of any discussion of transferring Ms. Fields's assets into partnership form (other than those

**[\*20]**     already in AMF Capital and Winnsboro Capital) until Ms. Fields's health appeared to be in precipitous decline. Yet thereafter the transfers proceeded rapidly.[12]

2.     Leading up to the formation of AM Fields, there were no significant changes in the amount or composition of Ms. Fields's wealth that might reasonably have triggered a nontax concern for asset management that did not exist before.

3.     The instances of financial elder abuse had occurred years before the formation of AM Fields.

4.     The record contains no contemporaneous documentary evidence of Mr. Milner's motivations for effecting the AM Fields transactions other than the email from Mr. Katzen to David Katzen about "obtaining a deeper discount" of Ms. Fields's partnership interest for tax purposes.

5.     The assets transferred to AM Fields were of a disparate character, promised no obvious synergies with each other, and came almost exclusively from Ms. Fields. Therefore, there was virtually no prospect of "intangibles stemming from a pooling [of assets] for joint enterprise." *See Estate of Harper v. Commissioner*, T.C. Memo. 2002-121, 83 T.C.M. (CCH) 1641, 1654.

6.     The assets transferred to AM Fields were not "working" interests in any business requiring active management. *Cf. Kimbell*, 371 F.3d at 267.

7.     Ms. Fields was not herself involved in any of the partnership planning or management. Rather, Mr. Milner represented both her interests and his own.

---

[12] The Estate relies on the expert testimony of Dr. Joseph Murphy, who concluded, among other things, that Ms. Fields did not have end-stage Alzheimer's. His conclusions are based on a posthumous review of Ms. Fields's medical records, most of which were drafted by Dr. Garcia, her primary care physician. Dr. Garcia also testified at trial. Given that Dr. Garcia had firsthand knowledge of Ms. Fields's health and Dr. Murphy did not, we disregard Dr. Murphy's testimony in favor of Dr. Garcia's.

[*21] 8. The asset transfers depleted Ms. Fields's liquidity to the point that the Estate could not pay Ms. Fields's bequests or its reported estate tax liability.

The four nontax purposes posited by the Estate are all plausible. But in view of the troublesome factors just listed and the timeline of events, it seems more likely that the four putative nontax purposes are post hoc "theoretical justification[s]" rather than "actual motivation[s]." *Estate of Bongard*, 124 T.C. at 118. Since the Estate bears the burden of proof, we conclude that the transfers to AM Fields were not bona fide.

C. *Conclusion Regarding Section 2036(a)*

Since the transfer of Ms. Fields's assets to AM Fields was not a bona fide sale, and since she retained applicable rights and interests with respect to those assets up until her death, section 2036(a) includes in the gross estate the date-of-death fair market value of the transferred assets. However, we must still address the interaction of section 2036(a) with sections 2033 and 2043. Section 2033 provides that "[t]he value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of [her] death." Section 2043(a) provides that if a transfer described in section 2036 is made

> for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

The interaction of sections 2033, 2036, and 2043 is best explained by the formula set out in *Estate of Moore*, T.C. Memo. 2020-40, at *42, as follows:

> The number that needs to be included in the gross estate [on account of sections 2033, 2036, and 2043] can be expressed in an equation: $V_{included} = C_d + FMV_d - C_t$, where
>
> $V_{included}$ = value that must be added to the gross estate;

**[\*22]**     $C_d$ = date-of-death value of the consideration received by the decedent from the transaction that remains in [her] estate, *see* [I.R.C. §] 2033;[13]

$FMV_d$ = fair market value at date of death of property transferred by the decedent whose value is included in the gross estate under section 2036; and

$C_t$ = consideration received by the decedent at the time of the transfer, which has to be subtracted under section 2043(a).

(Footnote omitted.) *See also Estate of Powell*, 148 T.C. at 414–15. Here, $C_d$ is the value of Ms. Fields's interest in AM Fields on the date of her death (June 23, 2016), $FMV_d$ is the death-of-death value of the five of Ms. Fields's assets contributed to AM Fields, and $C_t$ is the value of Ms. Fields's interest in AM Fields on May 27, 2016.[14] $C_d$ and $C_t$ are only 27 days apart, and neither party has argued that Ms. Fields's partnership interest changed in value over that short time. Therefore, those two partnership valuation numbers cancel out (i.e., $C_d - C_t = 0$), and we are left with determining the fair market value of the assets transferred (i.e., $V_{included} = FMV_d$). The net inclusion under sections 2036(a), 2043(a), and 2033 is effectively the date-of-death fair market value of the five transferred assets.

As to this remaining issue of the fair market value of the assets transferred, the Estate and the Commissioner dispute only one component, namely, the value of the 89,093 shares of NDBT stock held by AM Fields at Ms. Fields's death, representing about 3.5% of the total outstanding shares of NDBT as of December 31, 2015. The parties agree that NDBT stock traded at $61 per share on June 22, 2016, yielding a net asset value of $5,434,673 (i.e., 89,093 × $61) for AM Fields's holdings. As to fair market value, the Estate relies on its expert David Katzen, who noted that NDBT shares are "thinly traded," with a total of 35,800 shares traded publicly between January 1, 2016, and June 23, 2016, and a total of 44,700 shares traded publicly in 2015. Further positing that AM Fields's 89,093 shares "could require significant time to liquidate without depressing the market price," David Katzen

---

[13] The Estate did not elect the alternative valuation date under section 2032(a).

[14] We use the date of execution of the bill of sale for the five contributed assets, although most of the assets were actually transferred to AM Fields later.

[*23] concluded that a 10% illiquidity discount was appropriate, yielding a fair market value of $4,891,206.

The Commissioner relies on his expert David Fuller, president of Value Incorporated, a financial valuation consulting firm. Mr. Fuller agreed with David Katzen that an illiquidity discount of some amount was appropriate, given that AM Fields's NDBT holdings likely would need to be sold either over a period of months or in a private transaction in order to avoid depressing the public trading price. (Moreover, the existence of a willing private buyer for all 89,093 shares could not be guaranteed.) Therefore, Mr. Fuller compiled a list of 32 transactions that he deemed comparable to AM Fields's hypothetical sale of its NDBT holdings. Each of the 32 transactions was a private sale of a sizable block of restricted stock (i.e., stock that would not be publicly tradable for another 6 to 12 months) of a thinly traded bank or savings institution, occurring between 2003 and 2015.[15] Mr. Fuller then compared AM Fields's NDBT shares to the 32 comparable transactions along the following dimensions: block size (as a proportion of total shares outstanding); number of days until the stock could be publicly traded; number of shares relative to open market trading volume in the month of sale; open market trading volume relative to total shares outstanding; price volatility; and the underlying company's contemporaneous book value of equity, net profit margin, dividend yield, and 12-month return (adjusted to account for industry average stock performance). Mr. Fuller calculated NDBT's percentile ranking (relative to the 32 comparable transactions) across each of these dimensions, with an average ranking of 33.9%. That average ranking corresponded to a 5.7% illiquidity discount, as computed using the discounts observed in the 32 comparable transactions. Thus, Mr. Fuller estimated the date-of-death fair market value of AM Fields's NDBT shares at $5,124,897.

Because David Katzen did not offer any specific reasons or calculations to support his 10% discount, we accept Mr. Fuller's valuation. Therefore, we find that the total date-of-death fair market value of the assets that Ms. Fields transferred to AM Fields is $17,297,329 (i.e., $5,124,897 of NDBT stock plus the stipulated $12,172,432 aggregate value of AM Fields's four other assets). However, the Notice of Deficiency determines an inclusion of only $17,062,631 on account of the AM Fields assets, and the Commissioner did not plead an

---

[15] AM Fields's NDBT stock was not restricted, but Mr. Fuller deemed a trading restriction to have a similar economic effect as the largeness of a block of stock. In both cases the holder of the shares enjoys less liquidity than it might otherwise.

**[\*24]** increase to this amount in his Answer. Therefore, we determine that the value of the Estate's gross estate must include $17,062,631 to account for Ms. Fields's relationship with AM Fields. By contrast, the Estate did not report any amount of AM Fields's assets and reported the value of Ms. Fields's limited partner interest as $10,877,000, reflecting Katzen Marshall's appraisal of that interest.[16]

## IV. *Accuracy-Related Penalty*

The Commissioner determined that the Estate is liable for a 20% accuracy-related penalty on the underpayment of tax required to be shown on a return attributable to negligence or disregard of rules or regulations. *See* I.R.C. § 6662(a) and (b)(1). Section 6662(c) provides that "the term 'negligence' includes any failure to make a reasonable attempt to comply with the [Code], and the term 'disregard' includes any careless, reckless, or intentional disregard." Section 6664(c)(1) provides that "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." The Estate bears the burden of proof regarding the reasonable cause defense. *See* Rule 142(a)(1); *Higbee*, 116 T.C. at 446–47.

The Estate contends that Mr. Milner, as executor, had reasonable cause for any underpayment and acted in good faith in determining the Estate's estate tax liability.[17] It relies primarily on the testimony of Mr. Milner and Ms. Hammer, which (it contends) shows that Mr. Milner exerted considerable "effort to assess the [Estate's] proper tax liability," which pursuant to Treasury Regulation § 1.6664-4(b)(1) is generally the "most important factor" in determining reasonable cause and good faith. *See Gerhardt v. Commissioner*, 160 T.C. 436, 469 (2023). However, Mr. Milner never contended that he personally considered, researched, or understood the implications of section 2036 for the Estate's estate tax liability. Moreover, a reduction of approximately $6.2 million in the Estate's reportable assets thanks to the seemingly inconsequential

---

[16] Since we have found that the discounted value of Ms. Fields's limited partner interest in AM Fields did not change between the date she received it and her date of death, *see supra* p. 22, the parties' arguments regarding appropriate valuation of that interest will not impact the outcome of this case and need not be considered.

[17] The Estate does not attempt to show that neither "negligence" nor "disregard," as defined in section 6662(c), applies to its calculation of estate tax liability.

[*25] interposition of a limited partner interest between Ms. Fields and her assets on the eve of her death would strike a reasonable person in Mr. Milner's position as very possibly too good to be true.

Therefore, the Estate lacks reasonable cause for its underpayment unless Mr. Milner reasonably relied in good faith on competent and informed advice that the AM Fields transactions merited a steep discount in calculating the gross estate. To demonstrate reliance on professional tax advice as a basis for the reasonable cause defense, the Estate must show that (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the Estate provided necessary and accurate information to the adviser, and (3) the Estate actually relied in good faith on the adviser's judgment. *See Neonatology Assocs., P.A.*, 115 T.C. at 99.

There is no evidence that Ms. Hammer or anyone else at Armanino advised Mr. Milner that the Estate could both report the value of Ms. Fields's AM Fields interest at a discount and also exclude the entire value of the AM Fields assets. Indeed, Ms. Hammer testified that she did not provide any legal advice to the Estate. Nor is there evidence that Mr. Katzen or anyone else at Coats Rose specifically advised Mr. Milner that the Estate's treatment of AM Fields on its estate tax return was proper. Mr. Milner testified that Mr. Katzen mentioned the potential tax benefits of forming AM Fields, but he did not recount any specific legal advice that Mr. Katzen gave him. (Mr. Katzen did not testify at trial.)

The Estate did not meet its burden of establishing that it "actually relied in good faith on [an] adviser's judgment," *see Neonatology Assocs., P.A.*, 115 T.C. at 99, so it did not meet its burden of establishing reasonable cause. We thus hold it liable for the penalty under section 6662(a) and (b)(1).

To reflect the foregoing,

*Decision will be entered under Rule 155.*